IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JERRY B. BUCKHALT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:07CV845-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Jerry B. Buckhalt brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

Plaintiff filed applications for disability insurance benefits and supplemental security income which were denied at the initial administrative level. Thereafter, on June 15, 2006, an ALJ conducted an administrative hearing. The ALJ rendered a decision on January 25, 2007. The ALJ concluded that plaintiff suffered from the severe impairments of "right shoulder impairment, right carpal tunnel syndrome, ulnar neuropathy, lumbosacral disc

disease, tendonitis of the right elbow, amputation of two fingers on left upper extremity, and depression[.]" (R. 17). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the listings and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On June 15, 2007, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis

has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Evidence

Plaintiff Jerry Buckhalt previously worked as a construction carpenter and millwright. (R. 141).  In January 2000 he slipped on ice and fell, injuring his right shoulder.  (R. 253). He sought treatment for the injury in July 2000, due to increased pain and stiffness.  His physician ordered an X-ray, which revealed "moderately severe acromioclavicular osteoarthritis of the right shoulder with a large type 2 acromial spur." He also had developed adhesive capsulitis.  (R. 191-92). After an MRI showed a tear of the rotator cuff, plaintiff's doctor recommended surgery.  The physician, Dr. Ryan, advised plaintiff that due to the length of time since the injury, the tear might not be repairable.  He further advised plaintiff that "it may take six to twelve months post surgery to get as good as can be expected following surgery," and that he may not be able to return to "heavy-duty work."  (R. 190). Dr. Thomas Vasileff performed surgery on plaintiff's shoulder – resection of the distal clavicle and repair of the rotator cuff tear – on August 10, 2000.  Six months later,[1] Dr. Vasileff concluded that plaintiff was "medically stationary for his right shoulder[.]" He recommended that plaintiff see a rehabilitation medicine physician for a "permanent partial impairment rating."  Dr. Vasileff stated, "[i]n terms of what I can do for him, I told him there is probably not much except encourage him to stay on a good exercise program."  (R. 187).

---

[1] The record includes no treatment notes by either Dr. Ryan or Dr. Vasileff between the date of the surgery and a visit reflected in a February 14, 2001 physician's report by Dr. Vasileff. (R. 187, 188). That report appears to be a partial copy which includes only the bottom portion of a full-page form. (Compare R. 187 with R. 188-92).

3

Dr. Vasileff referred plaintiff to Dr. J. Michael James, who evaluated plaintiff on January 5, 2001. After an examination which included electrodiagnostic studies, Dr. James concluded that plaintiff suffered from postoperative right rotator cuff tear with residual capsulitis, traumatic arthritis of the right acromioclavicular joint with distal clavicular resection, and bilateral mild carpal tunnel syndrome. Dr. James concluded that plaintiff's shoulder weakness and pain was related to his capsulitis and shoulder injury. (R. 253-55). In March 2001, in response to a query from plaintiff's workers' compensation insurer, Dr. James concluded that plaintiff would incur a ratable permanent impairment due to his injury. He found that plaintiff would be unable to work as a millwright or carpenter because of "weight" and "arm use," and stated that he should be re-trained in another occupation. (R. 252).

On March 20, 2001, a physical therapist conducted a physical capacities evaluation. He was unable to obtain a valid assessment, and stated that certain indicators suggested "submaximal effort." He further stated that "[t]his may be explained by having a fear of reinjury or aggravation, a pain-focused behavior, a lack of understanding of the testing procedures, or a psychological overlay." (R. 218-42). In treatment notes for office visits in May, July, and October, plaintiff continued to complain of shoulder pain, which was aggravated by activity, including lifting with his right arm. (R. 215-17). In January 2002, plaintiff complained of "increasing right superior shoulder pain, aggravated with activity, particularly the use of the arm at or above the horizon." Dr. James examined the plaintiff and diagnosed "[r]eaggravation of supraspinatus tendinitis," and "chronic unrelated carpal tunnel syndrome." (R. 212). He prescribed physical therapy, but plaintiff reported increased

pain. (R. 207-09).

On September 13, 2002, plaintiff was evaluated by nurse practitioner Shawna Wilson.[2] Wilson stated, "He is tender about the anterior and lateral aspect of the shoulder more severely anteriorly. He has limited range of motion with extension as well as abduction. He does have a positive Hawkins and NEER. He strength does show some mild rotator cuff weakness, otherwise within normal limits." (R. 206). Wilson determined that plaintiff was "unable to tolerate repetitive use, overhead work, or lifting" with his right arm. (R. 194). On April 16, 2003, Dr. James noted restricted range of motion, weakness secondary to pain, and tenderness in the lateral joint margin. He diagnosed "[p]ostoperative capsular painful capsulitis." (R. 204).

In August 2003, plaintiff told Wilson that he had returned to work, working 51 hours per week, but could not perform to his employer's satisfaction and was "let go." He reported an increase in his symptoms with working. He told Wilson that he was relocating from Alaska to Alabama "to help care for his mother and work the family property." Wilson noted her impression of "[c]hronic right should pain secondary to injury of the right shoulder capsule. She prescribed two months of medication, and advised plaintiff to establish care in Alabama when he arrived. (R. 203).

In December 2003, plaintiff sought treatment from Dr. Bret Johnson at First Med of Dothan. He complained of ongoing pains in his right shoulder and lower back, and also of intense pain "off and on" in his right elbow, which was exacerbated by his work repairing

---

[2] The treatment notes for the visit are also signed by Dr. James. (R. 206).

trailers. An x-ray of plaintiff's elbow revealed calcification of the medial and lateral epicondyles "probably secondary to calcific tendonosis," and "spur formation posterior aspect of olecranon process." Dr. Johnson prescribed Lortab for plaintiff's pain, but told plaintiff that he would not prescribe the narcotic pain medication chronically. (R. 263-65).

Dr. Mark Ellis performed a consultative examination of the plaintiff on April 20, 2004. He found plaintiff to have muscle strength of 5/5 in both legs and arms, grip strength of 5/5 bilaterally, and a negative straight leg raise test. He noted crepitus in both shoulders, pain with movement, and decreased range of motion of the right shoulder secondary to pain. Dr. Ellis noted his impression as "right shoulder pain," "[t]endinitis of the right elbow," "[b]ack pain," and "[m]ultiple other medical problems, including amputation of two fingers of the left hand." (R. 269). Dr. Ellis did not complete a physical capacities evaluation.

Between June 2004 and June 2006, plaintiff received monthly pain management treatment from nurse practitioner Kelli McAllister and Dr. Kevin Hornsby of Slocomb Medical Associates, for complaints of pain in his right shoulder, left shoulder, lower back, both legs, neck, both arms, right hand, trigger finger, right thumb, and right elbow. (Exhibits 13F and 15F). McAllister completed disability forms in September, October, November and December 2005, indicating that plaintiff is "totally disabled" due to shoulder pain and cannot perform any lifting, pushing, pulling, or carrying, and cannot reach or work above his shoulder. A form completed in January 2006 expressing the same opinion is signed by both McAllister and Dr. Hornsby. (Exhibit 13F, R. 322-48). Treatment notes for an office visit in February 2006 indicate that plaintiff cannot lift more than ten pounds. (R. 361). In a

physical RFC questionnaire completed in June 2006, Dr. Hornsby indicates that plaintiff has limited strength and decreased lifting ability with his right arm, low back pain with muscle spasms and radiation down his legs. (R. 349). Dr. Hornsby notes that plaintiff's pain is severe enough to interfere constantly with his ability to perform even simple tasks, that he can sit for ten minutes at a time for a total of about four hours in an 8-hour workday and he is able to stand for ten minutes at a time for a total of about two hours in an 8-hour workday, that he would need to be able to shift positions at will, and that he would need hourly breaks of ten to fifteen minutes depending on his level of activity. (R. 350-51). According to Dr. Hornsby, plaintiff can never lift, occasionally look up or down or turn his head to the right or left, and rarely twist, stoop, crouch, climb ladders, or climb stairs. He can grasp, turn or twist objects, perform fine manipulations and reach (including overhead) 100% of an 8-hour day with his right arm and hand, and 0% of an 8-hour day with his left. (R. 352-53). Dr. Hornsby estimated that plaintiff would miss work more than four days per month due to his impairments or treatment. (R. 353).

Also in June 2006, three days after Dr. Hornsby signed the RFC form, nurse practitioner McAllister again expressed the opinion that plaintiff is unable to lift at all due to right shoulder pain, but that he is able to perform "partial duty" and can walk, stand, sit, stoop, kneel, bend, climb and repeatedly work eight hours per day. (R. 354).

Plaintiff received treatment for depression from SpectraCare in Dothan between July 2004 and June 2006. (Exhibits 12F, 16F).

**Issues**

Plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ's reasons for rejecting Dr. Hornsby's opinion are not supported by substantial evidence; (2) the ALJ's residual functional capacity assessment is not supported by substantial evidence; and (3) the ALJ failed to sustain his burden of establishing that there is other work in the national economy that plaintiff can perform.

The court concludes that the ALJ's decision does not reflect a fair evaluation of all of the evidence of record and, thus, that his residual functional capacity assessment is not supported by substantial evidence. In reviewing the Commissioner's decision, the court "must consider 'the entire record and take account of the evidence in the record which detracts from the evidence relied on by the [Commissioner].'" Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)(citation omitted). Measured against the record, the ALJ's decision is not sufficient to enable the court to "conclude that the ALJ considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005). At several points in the decision, the ALJ's discussion of the evidence presents the evidence out of context and eliminates consideration of evidence favorable to the claimant. For example:

(1) The ALJ relied heavily on the fact that plaintiff had only conservative treatment after his shoulder surgery. See R. 20 ("The claimant alleges significant symptoms of pain but the objective findings as well as conservative care do not support these allegations."); R. 21 ("The undersigned finds that the claimant's treatment after the shoulder surgery has been conservative in nature."). The ALJ also referred to plaintiff's shoulder surgery as "successful," and stated that "[t]here is no intensification of treatment which would be

expected if the claimant suffered as alleged." (R. 23). The ALJ further stated, "At a follow-up appointment on February 14, 2001, Dr. Vasileff noted that the claimant was medically stationary for his right shoulder and encouraged the claimant to stay on a good exercise program and seek rehabilitation treatment." (R. 21).

The ALJ does not appear to have considered the evidence that the surgeons who treated plaintiff for his rotator cuff tear and who performed the shoulder surgery expressed concern before the surgery that plaintiff's benefit from surgery might be limited because of the length of time between the injury and the surgery (R. 190). Nor does it appear that the ALJ considered the fact that Dr. Vasileff also told plaintiff – in the six-month follow-up appointment referenced by the ALJ – that he should see a rehabilitation medicine physician *"for a permanent partial impairment rating."* (R. 187)(emphasis added). The surgeon also stated, "*In terms of what I can do for him, I told him there is probably not much* except encourage him to stay on a good exercise program." (R. 187)(emphasis added). The ALJ characterized the surgery as "successful," but his discussion of plaintiff's two-and-a-half year course of treatment with Dr. James (the rehabilitative medicine specialist to whom Dr. Vasileff referred the plaintiff) does not reflect that plaintiff's chief complaint to Dr. James throughout the course of treatment was for persistent right shoulder pain, nor does it reflect Dr. James' conclusion that plaintiff suffered shoulder weakness and pain due to postoperative capsulitis. (See Exhibit 7F).

(2) The ALJ notes, correctly, that Dr. Hornsby's treatment records reflect "essentially normal" examinations with "full range of motion of all joints." (R. 22). However, the ALJ

fails to mention the observations in Dr. Hornsby's records on other occasions of decreased range of motion or of full range of motion only with pain.  (R. 324, 325, 340, 348, 355, 357, 358, 359).

(3) The ALJ states, "Regarding the claimant's right shoulder impairment, Dr. Hornsby noted on several occasions that the claimant had 'no complaints.'" (R. 22).  The ALJ's observation is accurate.  This appears to be a standard notation in the record with regard to the shoulder pain – "Stable, continue current medicine and treatment plan, there has been no significant change from last visit, and the pt. has no complaints" – which appears verbatim in many of the office notes.  (See R. 323, 325, 327, 329, 332, 334, 335, 337, 338, 340, 341, 342, 347, 355, 357, 359).  However, this standard notation most often appears with another standard description of plaintiff's problem: "Pt. is here for chronic pain and monthly follow up.  They clearly relay that they are not abusing medication and have to have monthly maintainaence [sic] medication to control severe pain after all other treatments have failed.  There has been no new injury noted." (See R. 323, 325, 327, 329, 334, 335, 337, 338, 340, 341, 342, 347, 357, 359).  In other instances, the notation of "pt. has no complaints" appears with other observations, including "Pt is here with recurring pain.  Pain scale today is 8/10" (R. 355); "Pt. is here today complaining of chronic recurring symptoms in the right shoulder and neck[.] Several visits and chronic symptoms persist and medications or injections have not improved or resoled [sic] symptoms.  It is unclear if this pain is spinal or involving a peripheral nerve based on previous complaints and symtoms [sic]" (R. 329); "per request we will increase dosing for better pain relief" (id.); "full range of motion with moderate pain"

10

(R. 325); "right shoulder with limited forward movement, and upward movement d/t pain" (R. 323). Thus, while the ALJ's statement is technically accurate, it selectively omits other observations, made in the same office visits, that are supportive of plaintiff's claim.

(4) The ALJ reports an observation from plaintiff's mental health counselor that "the claimant, with a great deal of pride, stated 'he was able to work circles around men half his age and with all of their fingers." (R. 22). The statement in the treatment note actually reads, "[c]ons. said with a great deal of pride that *up until the last few years*, he was able to 'work circles' around men half his age and with all of their fingers." (R. 308)(emphasis added).

(5) In assessing the claimant's credibility, the ALJ stated, "With regard to activities of daily living, the claimant testified that he works ½ days, 5 days per week, helping his friend." (R. 23). The ALJ finds this activity (and others) to be "not inconsistent with work." (Id.). The ALJ further states, "[T]he claimant testified that he wears work clothes when working for a friend taking rotten boards out of trailer [sic] 5 days per week ½ days. This is somewhat inconsistent with testimony of constant, burning pain occurring 24 hours, 7 days per week." (R. 23). The ALJ's present tense characterization of this work activity is deceptive. As the ALJ appeared to acknowledge earlier in his opinion (R. 20), plaintiff testified that he performed this activity "for around three months," and that it "aggravated" his shoulders and back so that he was unable to continue the work. (R. 411, 419).

(6) The ALJ rejected a lifting restriction imposed by the plaintiff's rehabilitation nurse practitioner as to plaintiff's right arm because plaintiff "testified at the hearing that he was able to lift 10 to 20 pounds." (R. 23). However, plaintiff was not asked at the hearing

11

whether he did so with his right arm. (See R. 414)(When asked how many pounds he could lift and carry, plaintiff responded, "I don't do that much, maybe 10, 20 at the most.").

Thus, taking into account the entire record, including the evidence in the record which detracts from the evidence relied on by the Commissioner, the court cannot conclude that the ALJ properly considered plaintiff's medical condition as a whole. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995); Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005).

Additionally, the ALJ's consideration of the opinion evidence was flawed. In reaching his conclusion regarding plaintiff's residual functional capacity, the ALJ gave "significant weight" to the RFC assessments made by two state agency decisionmakers. (R. 23; see Exhibits 6F and 10F). There is no indication that either of these decisionmakers are physicians or other acceptable medical sources, and the Commissioner agrees that the ALJ erred by giving them significant weight. (Commissioner's brief, p. 8). However, the Commissioner urges the court to find that this error was harmless. The court cannot agree. As noted above, the ALJ's opinion reflects a selective consideration of the other evidence of record in assessing plaintiff's credibility and residual functional capacity. Additionally, the ALJ relied on these state agency decisionmaker RFC assessments in rejecting the opinion of Dr. Hornsby, plaintiff's treating physician. (See R. 24)(according the state agency opinions "significant weight" and giving Dr. Hornsby's opinion "little weight" because, *inter alia*, it "contrasts sharply with the assessments provided by the State agency").

The court finds no substantial evidence in the record to support the ALJ's conclusion regarding plaintiff's ability to use his right arm for lifting and other work functions.

Accordingly, the ALJ's RFC assessment and his finding that plaintiff is able to perform other jobs existing in significant numbers in the national economy are not supported by substantial evidence.[3]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be reversed.  A separate judgment will be entered.

DONE, this 3rd day of December, 2008.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[3] The court does not intend to express any opinion as to whether plaintiff should be found, upon a proper evaluation of the evidence, to be disabled.